RECEIPT #_____
AMOUNT $ 150
SUMMONS ISSUED ✓
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. M
DATE 1-13-04

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

TIMOTHY GRADY, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

SUN LIFE ASSURANCE COMPANY OF CANADA INC., SUN LIFE ASSURANCE COMPANY OF CANADA U.S. BENEFIT PLANS COMMITTEE, JANET V. WHITEHOUSE, GREGG A. FRADKIN, CLAUDE ACCUM, MICHAEL E. SHUNNEY, JOHN T. DONNELLY, DAVEY S. SCOON, ROBERT P. VROLYK, ROBIN L. CAMARA, AND DOES 1 - 100,

Defendants.

Civil Action No.

04 - 10089 JLT

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

MAGISTRATE JUDGE Alexander

---

Plaintiff Timothy Grady ("Plaintiff"), a participant in the United States Employees' Sun Advantage Savings and Investment Plan (the "Plan"), on behalf of himself and a class of all others similarly situated, alleges as follows:

### INTRODUCTION

1. This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Plan fiduciaries, including Sun Life Assurance Company of Canada Inc. ("Sun Life" or the "Company").

2. 401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. Employees participating in a 401(k) plan may have the option of purchasing the mutual fund investment options created by, their employer, often the sponsor of the plan, for part of their retirement investment portfolios. Mutual funds within the

Massachusetts Financial Services family of funds, including MFS Growth Opportunity Fund, MFS High Income Fund, MFS Government Securities Fund, MFS Total Return Fund, and Massachusetts Investors Trust (collectively the "MFS Funds"), are investment alternatives in the Plan.

3. Plaintiff Timothy Grady was an employee of Sun Life and a participant in the Plan. Plaintiff's retirement investment portfolio included MFS Funds.

4. Plaintiff alleges that defendants, as fiduciaries of the Plan, breached their duties to him and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of MFS Funds.

5. During the Class Period, defendants knew or should have known that MFS Funds were imprudent investment alternatives for the Plan. Defendants played an active role in implementing unlawful mutual fund trading methods permitted by the Company that artificially diluted the value of certain investment alternatives within the Plan, namely, the MFS Funds, or had intimate knowledge of these activities.

6. Defendants are liable under ERISA to restore losses sustained by the Plan as a result of their breaching of their fiduciary obligations.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some defendants reside or

maintain their primary place of business in this district.

## PARTIES

**Plaintiff**

9. Plaintiff Timothy Grady was a Sun Life employee, was a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held MFS Funds in his retirement investment portfolio.

**Defendants**

10. Defendant Sun Life is an internationally diversified financial services organization providing savings, retirement and pension products, as well as life and health insurance to individuals and groups through its operations in Canada, the United States, the United Kingdom and Asia. Sun Life is the parent company of Massachusetts Financial Services Company ("MFS"), which manages the MFS Family of Mutual Funds. Sun Life was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

11. Defendant Sun Life U.S. Benefit Plans Committee (the "Committee") is the designated Plan Administrator and Trustee. As Plan Administrator and Trustee, the Committee was a fiduciary of the Plan within the meaning of ERISA in that it, and its individual members, exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

12. Defendant Janet V. Whitehouse ("Whitehouse") was the Chairperson of the Committee during the Class Period, and signed the Company's Form 11-K/A, filed with the SEC

on June 30, 2003 for the fiscal year ended December 31, 2002 (the "2002 Form 11-K/A"). Whitehouse was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

13. Defendant Gregg A. Fradkin ("Fradkin") was a member of the Committee during the Class Period, and signed the Company's 2002 Form 11-K/A. Fradkin was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

14. Defendant Claude Accum ("Accum") was a member of the Committee during the Class Period, and signed the Company's 2002 Form 11-K/A. Accum was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

15. Defendant Michael E. Shunney ("Shunney") was a member of the Committee during the Class Period, and signed the Company's 2002 Form 11-K/A. Shunney was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

16. Defendant John T. Donnelly ("Donnelly") was a member of the Committee during the Class Period, and signed the Company's 2002 Form 11-K/A. Donnelly was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to

management and administration of the Plan and/or management and disposition of the Plan's assets.

17. Defendant Davey S. Scoon ("Scoon") was a member of the Committee during the Class Period, and signed the Company's Form 11-K, filed with the SEC on March 31, 2003 (the "2002 Form 11-K"). Scoon was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

18. Defendant Robert P. Vrolyk ("Vrolyk") was a member of the Committee during the Class Period, and signed the Company's 2002 Form 11-K. Vrolyk was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

19. There are fiduciaries of the Plan whose identities are currently unknown to plaintiff, including additional individual members of the Committee, Plan Trustee(s) and other individual fiduciaries. Once their identities are ascertained, plaintiff will seek leave to join them under their true names.

20. Defendants include named and de facto fiduciaries with respect to the Plan. All defendants exercised discretionary authority or control regarding management of the Plan, management of the Plan's assets, and/or administration of the Plan.

### THE PLAN

21. The United States Employees' Sun Advantage Savings and Investment Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).

The relief requested in this action is for the benefit of the Plan and its participants/beneficiaries.

22. According to the 2002 Form 11-K/A, the Plan is a defined contribution plan sponsored by Sun Life for the benefit of employees of the Company.

23. The stated purpose of the Plan is to "permit eligible employees of the [Company] and participating employers to defer and receive employer-matching contributions in order to provide funds for employees in the event of ... retirement." 2002 Form 11-K/A.

24. Participating employees were/are permitted to contribute to the Plan 1% to 16% of his or her compensation for 2001 and 1% to 60% of his or her compensation for 2002. Furthermore, the Company makes matching contributions for each participant at the rate of $.50 for each $1.00 contributed by the participant to a pooled matching account, provided that no matching contribution will be made for participant contributions in excess of 6% of compensation.

25. According to the Company's 2002 Form 11-K/A, the Committee is the Plan Administrator and Trustee of the Plan. Moreover, the 2002 Form 11-K/A further states that certain Plan investments are managed by Sun Life and its affiliates.

26. As of December 31, 2002, the Plan's investments in MFS Funds were valued at **$40,918,542, or 37%** of the total investments held by the Plan.

27. As discussed below, internal Company memoranda have revealed that the Company permitted illegal timing activity to occur in *at least two*, if not more, of the MFS Funds held by the Plan: the MFS Total Return Fund and the Massachusetts Investors Trust.

28. As a result, at least some, if not all, of the MFS Funds in the Plan were diluted in value at all times during the Class Period. Furthermore, based on information and belief, it is

likely that the MFS Funds will continue to drop in value as more details emerge on the Company's illegal timing activities, and as MFS incurs currently indeterminate fines, restitution, and settlement fees.

## CLASS ACTION ALLEGATIONS

29. Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between December 15, 1998 and the present (the "Class Period") and whose accounts included investments in MFS Funds.

30. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time, and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, hundreds of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

31. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

> (a) whether defendants each owed a fiduciary duty to plaintiff and members of the Class;
>
> (b) whether defendants breached their fiduciary duties to plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c) whether defendants violated ERISA; and

(d) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

32. Plaintiff's claims are typical of the claims of the members of the Class because plaintiff and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

33. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

34. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

35. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' FIDUCIARY STATUS

36. During the Class Period, upon information and belief, defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

37. During the Class Period, all of the defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

38. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief, at least Sun Life and the Committee are named fiduciaries of the Plan.

39. Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, Sun Life chose to internalize this fiduciary function.

40. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

## DEFENDANTS' CONDUCT

### A.  MFS Funds Were Imprudent Investments for the Plan

#### 1.  Illegal Market Timing Schemes

41. This action concerns a fraudulent scheme and course of conduct which was intended to, and indeed did, benefit the Company at the expense of unsuspecting Plan participants. In connection therewith, defendants violated their fiduciary duties to Plan participants in return for substantial fees and other income for themselves and their affiliates.

42. The actions of the defendants have harmed plaintiff and members of the class. In essence, the defendants' have diluted the interests of Plan participants by allowing market timing to occur in at least two of the MFS Funds that were investment alternatives in the Plan.

43. Mutual funds are designed for buy-and-hold investors, and are therefore the favored homes for Americans' retirement and college savings accounts. In mutual funds, the market value of a fund share is known as the Net Asset Value ("NAV"). Since mutual funds hold a number of securities, the net asset value must be calculated at the end of day on a daily basis (as opposed to stocks that change prices by the second). Thus, quick-turnaround traders routinely try to trade in and out of certain mutual funds in order to exploit inefficiencies in the way mutual funds set their NAV.

44. This "in and out" strategy works only because some funds use "stale" prices to calculate the value of securities held in the fund's portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that holds Japanese shares. Because of the time zone difference, the Japanese market may close at 2:00 a.m. New York time. If the U.S.

mutual fund manager uses the closing prices of the Japanese shares in his or her fund to arrive at an NAV at 4:00 p.m. in New York, he or she is relying on market information that is fourteen hours old. If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it later opens, the stale Japanese prices will not reflect them, and the fund's NAV will be artificially low. Put another way, the NAV does not reflect the true current market value of the stocks the fund holds. On such a day, a trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling. Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.

45.     Effective timing captures an arbitrage profit that comes ***dollar-for-dollar out of the pockets of the long-term investors***: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

46.     Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways. They impose their short-term transaction costs on the long-term investors. Indeed, trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market. Accordingly, fund managers often seek to minimize the disruptive impact of timers by keeping cash on hand to pay out the timers' profits without having to sell stock. This "strategy" does not eliminate the transfer of wealth out of the mutual fund caused by timing; it

only reduces the administrative cost of those transfers. However, at the same time it can also reduce the overall performance of the fund by requiring the fund manager to keep a certain amount of the funds' assets in cash at all times, thus depriving the investors of the advantages of being fully invested in a rising market. Some fund managers even enter into special investments as an attempt to "hedge" against timing activity (instead of just refusing to allow it), thus deviating altogether from the ostensible investment strategy of their funds, and incurring further transaction costs.

47.     Mutual fund managers are well aware of the damaging effect that timers have on their funds. While it is virtually impossible for fund managers to identify every timing trade, large movements in and out of funds are easy for managers to spot, and mutual fund managers have tools to fight back against timers.

48.     Fund managers typically have the power simply to reject timers' purchases. As fiduciaries for their investors, mutual fund managers are obliged to do their best to use these weapons to protect their customers from the dilution that timing causes.

49.     The incentive to engage in such wrongdoing is as follows. Typically a single management company sets up a number of mutual funds to form a family. While each mutual fund is in fact its own company, as a practical matter the management company runs it. The portfolio managers who make the investment decisions for the funds and the executives to whom they report are all typically employees of the management company, not the mutual funds themselves. Still, the management company owes fiduciary duties to each fund and each investor.

50.     The management company makes its profit from fees it charges the funds for

financial advice and other services. These fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money the manager makes. The timer understands this perfectly, and frequently offers the manager more assets in exchange for the right to time. Fund managers have succumbed to temptation and allowed investors in the target funds to be hurt in exchange for additional money in their own pockets in the form of higher management fees.

51. Thus, by keeping money – often many millions of dollars--in the same family of mutual funds (while moving the money from fund to fund), the market timer assured the manager that he or she would collect management and other fees on the amount whether it was in the target fund, the resting fund, or moving in between. In addition, sometimes the manager would waive any applicable early redemption fees. By doing so, the manager would directly deprive the fund of money that would have partially reimbursed the fund for the impact of timing.

52. As an additional inducement for allowing the timing, fund managers often received "sticky assets," which assured a steady flow of fees to the manager.

53. These arrangements were never disclosed to mutual fund investors such as Plan participants. On the contrary, many of the relevant mutual fund prospectuses contained materially misleading statements assuring investors that the fund managers discouraged and worked to prevent mutual fund timing.

### 2.     The Timing Scheme at Sun Life's Subsidiary Company

54. Upon information and belief, the defendants permitted illegal timing to occur in at least two, and likely a number, of the MFS Funds available to Plan participants as investment alternatives.

55. It is widely acknowledged that timing inures to the detriment of long-term shareholders such as plaintiff and similarly situated Plan participants by diluting their investment holdings. Because of this detrimental effect, mutual fund prospectuses typically state that timing is monitored and the funds work to prevent it. Nonetheless, in return for investments that would increase fund managers' fees, fund managers entered into undisclosed agreements to allow timing.

56. The mutual fund prospectuses for the MFS Funds at issue created the misleading impression that the Company was vigilantly protecting investors against the negative effects of timing. In fact, the opposite was true: MFS managers sold the right to time their funds to certain market timers. The prospectuses were silent about these arrangements. For example, prospectuses distributed to MFS Funds customers (including, upon information and belief, Plan participants) plainly state:

> MFS Funds **do not permit** market timing or other excessive trading practices. Excessive, short-term (market timing) trading practices may disrupt portfolio management strategies and harm fund performance. MFS Funds **will reject or restrict** an investor's purchase orders if there is a history of market timing. (Emphasis added).

57. Contrary to such language, MFS created a specific class of mutual funds through which it allowed illegal market timing to occur.

58. As a result of the "timing" of the MFS Funds, certain market timers, the Company, and their intermediaries profited handsomely. The losers were unsuspecting Plan participants and other long-term mutual fund investors. Thus, the defendants' profits came dollar-for-dollar out of the pockets of investors such as plaintiff and similarly situated Plan

participants.

### 3. The Timing Scheme Unfolds

59. On September 3, 2003, the New York State Attorney General Elliot Spitzer (the "Attorney General") attacked the mutual fund industry by filing a complaint charging fraud against Canary Capital Partners, LLC, Canary Capital Partners, Ltd. and Canary Investment Management, LLC (collectively, "Canary") in connection with the unlawful mutual fund practices of late trading and timing. More specifically, the Attorney General alleged the following: "Canary developed a complex strategy that allowed it to in effect sell mutual funds short and profit on declining NAVs." Additionally, the Attorney General alleged that Canary set up arrangements with Bank of America, Bank One, Janus, and Strong to late trade and time those companies' respective mutual funds. The Attorney General further alleged:

> Bank of America...(i) set Canary up with a state-of-the art electronic late trading platform, allowing it to trade late in the hundreds of mutual funds that the bank offers to its customers, (ii) gave Canary permission to time the Nations Funds Family (iii) provided Canary with approximately $300 million of credit to finance this late trading and timing, and (iv) sold Canary the derivative short positions it needed to time the funds as the market dropped. None of these facts were disclosed in the Nations Funds prospectuses. In the process, Canary became one of Bank of America's largest customers. The relationship was mutually beneficial in that Canary made tens of millions through late trading and timing, while the various parts of the Bank of America that serviced Canary made millions themselves.

60. In connection with an examination of active trading of mutual fund shares by the SEC and the Attorney General, MFS received inquiries and subpoenas for documents from those agencies.

61. On December 8, 2003, Sun Life and MFS announced that the staff of the Boston

00001454.WPD ; 1                              -15-

office of the SEC had indicated that it intended to recommend to the SEC that an enforcement action be taken against MFS alleging, in effect, that the disclosure in certain of MFS's fund prospectuses concerning market timing was misleading, and in breach of federal law.

62. On December 9, 2003, The New York Times (the "Times") reported that MFS "allowed privileged clients to trade quickly in and out of its biggest funds while saying it restricted the practice for the vast majority of its shareholders, according to a memorandum from a senior company executive." The Times further reported that the memorandum showed that in 2001, executives at MFS essentially created two classes of funds - a small group of large funds that would accept rapid-fire trades, a practice known as market timing, and a larger group of international funds that would not. At no time, though, did MFS change the language in its prospectuses, which said that market timing was not permitted in any of its funds. Additionally, the Times reported that "[a]mong the most popular offerings was MFS Emerging Growth, one of the five equity funds that MFS made available to market timers. But no restrictions were placed on Massachusetts Investors Trust, Massachusetts Investors Growth Stock Fund, MFS Research Fund, MFS Total Return Fund or the emerging growth fund. The rationale was that because these funds were very large and liquid, excessive trading would not harm shareholders."

63. The defendants, in permitting, upon information and belief, the illegal timing activity to occur in the MFS Funds, have breached their fiduciary duties to plaintiff and the class by lying to Plan participants about their effort to curb market timers by entering into undisclosed agreements intended to boost their fees and permitting their own managers to time the MFS mutual funds.

**B.   Defendants Knew or Should have Known that MFS Funds Were Not Prudent Plan Investments**

64.  Throughout the Class Period, the Company and its subsidiaries engaged in illegal conduct involving timing of the MFS Funds, which, collectively, represented that largest single available investment alternative in the Plan.

65.  The Company's illegal timing activities materially diluted the value of the MFS Funds.

66.  At all relevant times, defendants knew or should have known that SunLife's subsidiary, MFS, was improperly diluting the revenues of the MFS Funds by devising and implementing a scheme to obtain substantial fees and other income for itself and its affiliates by allowing favored investors to engage in timing of the MFS Funds throughout the Class Period and in violation of their fiduciary duties to the Plan participants.

67.  Defendants failed to conduct an appropriate investigation into whether the MFS Funds were prudent investments for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding the true investment worthiness of the MFS Funds, such that other fiduciaries and the Plan participants could make informed decisions regarding the MFS Funds and otherwise failed to protect the Plan and its participants against inevitable losses.

68.  An adequate investigation by defendants would have revealed to a reasonable fiduciary that investment by the Plan in the MFS Funds, under these circumstances, was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

69.  Because defendants knew or should have known that MFS Funds were not prudent investment options for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in MFS Funds.

70.  Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of MFS Funds; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as Plan fiduciaries to the extent that as a result of their employment by the Company they could not loyally serve Plan participants in connection with the Plan's acquisition and holding of MFS Funds.

### C. Defendants Regularly Communicated with Plan Participants Concerning Purchases of MFS Funds, Yet Failed to Disclose the Imprudence of Investment in MFS Funds

71.  Upon information and belief, the Company regularly communicated with employees, including Plan participants, about the performance and prospects of the MFS Funds, collectively, the largest single asset class in the Plan. During the Class Period, the Company fostered a positive attitude toward the MFS Funds, and/or allowed Plan participants to follow their natural bias towards investment in the mutual fund offerings of their employer by not disclosing negative material information concerning investment in the MFS Funds. As such, Plan participants could not appreciate the true risks presented by investments in the MFS Funds and therefore could not make informed decisions regarding investments in the Plan.

### CLAIMS FOR RELIEF UNDER ERISA

72.  At all relevant times, defendants were and acted as fiduciaries within the meaning